IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KEVIN CONCANNON, LLC d/b/a LIFELINE PHARMACY,[1] | ) ) ) | Case No. 23-90759 (CML ) |
| Debtor. | ) ) | |

**DECLARATION OF CHARLES BERK IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Charles Berk declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:[2]

1.  I am the Chief Restructuring Officer of Kevin Concannon, LLC d/b/a Lifeline Pharmacy, the above-captioned debtor and debtor in possession ("Lifeline" or the "Debtor" or the "Company"). I have held this position since July 10, 2023. The Debtor operates a specialty community pharmacy in Edinburg, Texas, that distributes limited distribution drugs.

2.  I submit this declaration in support of the First Day Motions (as defined below) filed by the Debtor, and to familiarize the Court with the Company, its business, the circumstances leading up to this Chapter 11 case. Except as otherwise indicated, the facts set forth in this Declaration are based upon (i) my personal knowledge of the Debtor's business and operations, (ii) my review of relevant documents and information provided to me by the Debtor, and (iii) my view based upon my general experience and knowledge as a restructuring professional.

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Kevin Concannon, LLC d/b/a Lifeline Pharmacy (7569). The Debtor's service address is: 2500 West Trenton Road, Edinburg, Texas 75839.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First Day Motions (defined and described below).

4875-6171-4802.3

3.      I have a bachelor's degree in economics from Emory University, an MBA from Rutgers University Graduate School of Management. I am a Certified Public Accountant (CPA), Certified in Financial Forensics (CFF) and a Certified Insolvency and Restructuring Advisor (CIRA).  I have been practicing for over 35 years in the field of accounting, audit, financial advisory and restructuring, with a focus in the healthcare industry.

4.      The CBIZ professionals are well qualified to act on the Debtor's behalf, given their extensive knowledge and expertise in chapter 11 proceedings. I personally have over 20 years of experience in the restructuring industry representing various parties-in-interest in chapter 11 bankruptcies across numerous industries, including hospitality, retail, real estate, and consumer products. During that time, I have provided restructuring advisory services to various companies and stakeholders in the troubled credit environment.  I have also served as financial advisor to Chapter 7 and Chapter 11 Trustees, and Plan Administrators, as well as serving as the Liquidating and Plan Administrator on numerous healthcare related companies.  My experience also includes consulting on matters before the bankruptcy court which included forensic investigations, litigation support, dispute advisory work and expert testimony.

5.      CBIZ professionals specialize in corporate recovery and turnaround services, including financial services, developing and reviewing organizational plans, forensic accounting, analyzing pre- and post-petition operations, preparing liquidation analyses, assessing management and company personnel, valuations, and related services. These services are essential to my ability to perform duties as CRO in this case. CBIZ has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States. The Debtor has selected CBIZ to provide them services in this case based upon, among other things: (a) the Debtor's need to retain an independent officer charged with administering the Debtor's day-

to-day operations in the case; (b) my extensive experience in providing financial advisory services in chapter 11 cases such as these, along with the CBIZ personnel. I further submit that CBIZ is well-qualified to provide services to the Debtor in a cost-effective, efficient, and timely manner. The CBIZ personnel working on this matter will be overseen by me.

6. Since my retention as CRO, I have worked closely with the Company's principal and the Company's counsel to understand the situation, strategize on how best to deal with the Company's capital structure and various pending and to-be-filed litigation, and otherwise prepare for a restructuring that will allow the Company to emerge as a going concern, either stand-alone or through a sale process.

7. This declaration is organized into four parts.  **Part I** provides information about the Debtor's background and Mr. Concannon's purchase of the Pharmacy; **Part II** describes Mobeen's alleged fraudulent activity and the Debtor's resulting capital structure; **Part III** offers information on the Company's recent suspension by CVS Caremark ("Caremark"), its largest pharmacy benefit manager; and **Part IV** summarizes the relief sought through the protections afforded by chapter 11, as well as the various motions and pleadings filed (the "First Day Motions") requesting operational and procedural relief to help the Company transition into chapter 11 and continue ordinary course operations.

8. CBIZ was hired to help provide, among other things, (i) the Debtor's creditors with comfort that an alleged fraudulent scheme perpetrated by the Company's prior owner, Mobeen Ahmed ("Mobeen"), had ceased, (ii) a path towards correcting and resolving the consequences that flowed from such alleged fraud and (iii) assurance to Caremark that there are no ongoing schemes of artifice.

9. In that regard, CBIZ will be conducting an internal investigation that it plans to share with the appropriate regulatory agencies and with the Court in connection with litigation that the Debtor plans to institute during the course of the chapter 11 case. The corrective actions the Company has taken and will take, with the assistance of its professionals, should place the Company in a strong operational position. With the tools available to it under the Bankruptcy Code, the Company should be able to shore up its financial situation and continue as a going concern rather than liquidate.

I. **Background / Purchase of the Company**

10. The facts in this section are based upon my information and belief as a result of discussions with various persons, and my initial inquiries into the Debtor's situation since the time CBIZ was retained by the Debtor.

11. The Debtor acquired Lifeline Pharmacy from Mobeen, the prior owner, on or about October 31, 2022 (the "Sale Date"). Prior to that time, in or around April 2022, the Debtor's principal, Kevin Concannon, was contacted by Guy Stillwell of Stillwell RX Brokerage Firm (the "Broker") and presented with what Mr. Stillwell referred to as a "once in a lifetime deal" to purchase the Pharmacy for $16.6 million, as Lifeline had grown quickly over the past two years.

12. Based upon my initial inquiries, which remains ongoing, it appears that the increase in growth under Mobeen's ownership was unusual. Point in fact, it appears that the Debtor's financial statements prepared while it was owned by Mobeen reflected growth from 2020 revenue of $5.6 million to 2021 revenue of $46.9 million, more than a 700% increase.

13. Prior to the Sale Date, CCK Strategies, PLLC ("CCK") was engaged to provide due diligence to the buyer, Kevin Concannon LLC. In May 2022, CCK issued reviewed financial

statements as of April 30, 2022, December 31, 2021 and 2020 (the "CCK Report"). The CCK financial statements presented Mobeen's pharmacy had achieved significant sales and net income increases from 2020 to 2021 and into the first four months of 2022. CCK reported that Members' Equity was approximately $9.3 million as of April 30, 2022. It appears that Mobeen disbursed approximately $7.8 million in the form of Distributions between May 1, 2022 and October 31, 2022.

14.     In June of 2022, Mr. Concannon made a down payment of $25,000 towards the purchase of the business while, simultaneously, he worked on purchase financing with two potential lenders: (i) Newtek Small Business Finance, LLC ("Newtek") for $4.65 million and (ii) SLR Capital Partners, LLC ("SLR") for $15 million. Newtek and SLR had preliminarily agreed to a staggered closing whereby Newtek would fund first, then followed by SLR approximately one month later. As it turned out, SLR backed out of the deal, contending it was unable to verify Mobeen's representation as to the accounts receivable values. As a result, Mobeen agreed to provide the following seller financing notes: (i) Promissory Note A - in the amount of $6,294,784.00; and (ii) Promissory Note B - in the amount of $575,000, (collectively the "Sellers' Notes"). Promissory Note A matures on January 1, 2025, and calls for monthly payments of $270,285.20.

15.     The sale of the Pharmacy (the "Sale") closed on October 31, 2022. The purchase price was amended on October 31, 2022 to $10.9 million, plus the value of the inventory, primarily in connection with accounts receivable becoming an Excluded Asset.

16.     On or around the time of the Sale, Mobeen requested that he enter into a four-year consulting agreement with the Debtor, pursuant to which he would assist in the transition, in exchange for $50,000.00 per month, for a total of $2.4 million (the "Consulting Agreement").

17. Mobeen alleged that the Consulting Agreement was necessary to ensure a smooth transition of the Pharmacy to the Debtor from both a business and a personnel perspective. Post Sale, I was informed that Mobeen continued to be the primary person responsible for billing including the submissions of Prior Authorizations.

II. **Alleged Improprieties / Capital Structure**

18. On or around November 7, 2022, just seven days after the Sale, the Debtor became aware that Mobeen's girlfriend and the Pharmacy's office manager, intended to purchase another similar type pharmacy in Harlingen, Texas, just twenty-five miles from Lifeline's location in Edinburg, Texas. After Mr. Concannon expressed surprise and dismay, and highlighted that the any such purchase would violate a non-compete agreement, Mobeen's girlfriend abandoned the proposed transaction. It should be noted that Mobeen is currently involved in litigation stemming from him breaking his non-compete in 2019 in another transaction, when he purchased Lifeline Pharmacy.

19. **Prior Authorization -** Mr. Concannon believes, and Caremark has alleged, someone at the Pharmacy impersonated doctors, and/or doctors' staff, when they fraudulently completed portions of online forms (Prior Authorizations) designed to persuade insurance companies to cover prescriptions that would otherwise have not been covered—either because a less expensive, alternative drug should have been used first, or because the patient's symptoms did not warrant use of the particular drug being prescribed. The physicians have told Caremark the portion of the form they should have completed was not completed by their office. Mr. Ahmed was allegedly the sole person responsible for completing all Prior Authorizations for Lifeline Pharmacy.

20.     **E-vouchers** - I am informed that, between November and December of 2022, Mobeen allegedly billed approximately $1 million worth of medications that were never filled to customers.[3] Mobeen either personally cashed-in e-vouchers, or directed his staff to cash-in e-vouchers, for the popular drug, Mounjaro. This involved printing labels, which would be affixed to the package and sold to the patient who had a prescription for the drug. The drugs were never purchased from the pharmacy's supplier, which was part of the requirement for "cashing-in" the e-voucher.  In fact, I was told that when the Debtor's staff asked Mobeen why the orders were on the shelf, Mobeen responded by expressly directing them not to fill the orders. E-vouchers are designed to help offset the patient's out of pocket costs. These prescriptions were never filled or sold to patients, but the funds were received from the manufacturer, or the manufacturer's charitable foundation.

21.     I am also informed that during December 2022 and January 2023, Mobeen purchased $5.3 million worth of inventory for the Debtor (the "Inventory Purchase") from McKesson Corporation ("McKesson"), the Debtor's main wholesaler.  In connection with the Inventory Purchase, I was told that Mobeen acquired a security interest in such inventory.  To effectuate the Inventory Purchase, Mobeen used a shared log-in to access McKesson's site and place the order.  Based upon information and belief, Mobeen knew he was over ordering and that the Debtor lacked funding to pay for the inventory in question.

22.     The excessive Inventory Purchase jeopardized the Debtor's goodwill with McKesson and added to its financial problems.  Over the following months, the Debtor negotiated with McKesson and entered into a payment plan that (i) required the Debtor to buy goods on a

---

[3] Based upon my experience in the field, the standard practice for pharmacy is to order medication, then bill the insurance carrier, fill it to the customer within fourteen (14) days or reverse the claim to the insurance carrier.

Cost on Delivery basis and (ii) charged interest on the outstanding balance of Mobeen's Inventory Purchase.

23. As of the Petition Date, the Debtor's obligations to McKesson are in excess of $8.0 million.

24. Shortly after the Inventory Purchase during the December 2022/January 2023 period, Mobeen declared a default under the Seller Notes due to an alleged default with McKesson. Mobeen threatened to implement foreclosure proceedings.

25. Upon information and belief, by the end of 2022 Mobeen had collected the account receivables he was contractually owed, although during 2023 I was told he refused to transfer title back to the Debtor. During my initial inquiry, there appears to be no accounting of the contractual amount of accounts receivable owed to and collected by Mobeen. Upon information and belief, Mobeen allegedly diverted several million dollars of accounts receivable to his own accounts and failed to turn those funds over to the Debtor. In fact, I was told that in early 2023 Mr. Concannon asked that he transfer all incoming accounts receivables to the Debtor's bank account. Mobeen allegedly replied "No."

26. As a result of Mobeen's alleged fraudulent conduct, in order to stay afloat, the Company entered into several Merchant Cash Advances (each an "MCA" and collectively, the "MCAs"). The MCAs were intended to supply immediate capital to ensure the Debtor continued to operate.

27. On November 17, 2022, the Debtor entered into an MCA with Venture Debt, LLC ("Venture") for a total of $872,737.50 in funding in exchange for $1,215,000.00 in future receivables.

28. On May 4, 2023, the Debtor entered into an MCA with Cloudfund LLC ("Cloudfund") for a total of $712,454.00 in exchange for $1,124,250.00 in future receivables.

29. On May 4, 2023, the Debtor entered into an MCA with Coldwater Capital LLC ("Coldwater") for a total of $424,985.00 in exchange for $749,500.00 in future receivables.

30. On May 22, 2023, the Debtor entered into an MCA with Symplifi Capital, LLC ("Symplifi") for a total of $600,000 in exchange for $894,000.00 in future receivables.

31. On May 31, 2023, the Debtor entered into an MCA with Coldwater Capital LLC ("Coldwater") for a total of $800,000 in exchange for $1,200,000.00 in future receivables.

### III.   Caremark Investigation

32. On or around April 18, 2023, Mobeen informed the Debtor he had received a fax (the "Caremark Investigation Report") from Caremark, contending it was a mere audit and that he would handle the matter. Mobeen, however, did not provide the Debtor or its principal with the Caremark Investigation Report, nor did he keep the Debtor updated with respect to any response or any other communications with Caremark regarding the same.

33. Ultimately, as it turns out, Mobeen allegedly took no action with respect to the Caremark Investigation Report. On June 9, 2023, the Debtor received correspondence from Caremark stating that Caremark will be placing Lifeline Pharmacy on temporary adjudication suspension for WellCare and Centene health plans effective June 19, 2023 (the "Suspension Letter"). See **Exhibit A**. The basis for the Suspension Letter was that Lifeline Pharmacy was under investigation due to alleged extensive fraudulent activity, both prior to and following, the Pharmacy's purchase by the Debtor.

34. Practically speaking, the Suspension Letter crippled the Debtor's ability to generate revenue: Caremark is the Debtor's largest pharmacy benefits manager, accounting for roughly

9

85% the Company's customers.

34. Since being retained by the Debtor, Counsel to the Debtor, CBIZ and I have responded to Caremark's Suspension Letter with a corrective action plan. This week were informed that Centene has requested Caremark reinstate the Debtor. We have also been working with McKesson, negotiating potential terms with the Debtor's major supplier. Finally, we are actively negotiating with a potential DIP lender.

## IV.   Relief Requested in Chapter 11

36. On August 2, 2023 (the "Petition Date", the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code").

37. The Debtor intends to use the tools of the Bankruptcy Code to restructure its debts, rightsize its capital structure, investigate and prosecute its claims against Mobeen, and preserve its going concern value.

38. I have reviewed, and am familiar with, the content and substance of each First Day Motion and believe that the relief sought therein motion (a) is necessary to enable the Company to operate in Chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element in the Company's ability to achieve a successful restructuring and maximization of value for the estates' stakeholders.

## **C**ONCLUSION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 2nd day of August 2023.

> */s/ Charles M. Berk*
> Charles M. Berk
> Chief Restructuring Officer